NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOCELYNE LAVONNA BUSH, | CIVIL ACTION NO. 13-5531 (MLC) |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**COOPER, District Judge**

The plaintiff, Jocelyne Lavonna Bush ("Bush"), seeks review of the final decision of the defendant, the Commissioner of the Social Security Administration ("Commissioner"), denying her claim for Social Security Disability and Supplemental Security Income Benefits (collectively "Benefits"). (See dkt. entry no. 1, Compl.) See 42 U.S.C. § 405(g). The Court, for the reasons stated below, will remand the matter for further administrative proceedings.

BACKGROUND

The Court writes primarily for the parties and assumes their familiarity with the record. The Court will not restate Bush's medical history with the exception of a brief overview. In August and September of 2008, Bush was seen by medical professionals for, inter alia, chest pain, heart palpitations, uncontrolled hypertension, and insulin-dependent diabetes. (Dkt. entry no. 11, Admin. R. at 26-27, ALJ Decision.) She was hospitalized on June 19, 2009 —

the alleged onset-of-disability date — for acute shortness of breath. (Id. at 27.) Bush underwent triple coronary bypass surgery on June 24, 2009 and was discharged on June 28, 2009. (Id.) On September 15, 2009, Bush saw Dr. Lewis Horvitz, and while she was not having palpitations or respiratory distress, she reported complaints of lethargy and fatigue. (Id.) Dr. Shahid Meer examined Bush in October 2009 based on her complaints of shortness of breath. "Dr. Meer's impressions were respiratory abnormality, diabetes type II, and hypertension." (Id.) Bush saw Dr. Meer again on November 5, 2009 with complaints relating to sleep and memory loss, and Dr. Meer, following examination, recommended that she "lose weight, avoid sleeping in the supine position and avoid benzodiazepines before sleeping." (Id. at 28.) Following a nocturnal polysomnography study, Dr. Meer reported his impression that Bush suffered from obstructive sleep apnea, and a CPAP machine was prescribed for Bush to use every night for six to seven hours. (Id.) Bush's symptoms continued, and Dr. Horvitz noted his impression on December 15, 2009 that her persistent shortness of breath was likely due to sleep apnea. (Id.)

    Dr. G. Bousvarios and Dr. Morris Feman, medical consultants with the New Jersey Division of Disability Determinations, reported on November 12, 2009 and March 26, 2010 respectively that Bush "had the capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently, sit for about six hours in an eight hour workday and stand/or walk" for about two hours (according to Dr. Feman) or six hours (according to Dr. Bousvarios) in an eight-hour work day. (Id.) Both concluded that she had no "manipulative or environmental limitations," and Dr. Feman also found that she "could never climb ladders, ropes or

scaffolds, but she could frequently stoop and occasionally climb stairs, kneel, crouch and crawl." (Id. at 28-29.) Dr. William Kropiniki, who had been treating Bush since October 13, 2009, reported on January 6, 2010 that "she has been diagnosed with obstructive sleep apnea, coronary artery disease and hypertension and that she experiences chest discomfort with exertion and that rest alleviates the symptoms." (Id. at 28.) However, "Dr. Kropiniki declined to give an opinion on the claimant's ability to do work related activities." (Id.)

Bush was hospitalized on June 17, 2011 due to her complaints of numbness and weakness on her right side. (Id. at 29.) An examination revealed that her "[s]trength and sensation was . . . decreased in the right arm and leg." (Id.) The impression following her June 18, 2011 examination was that she "suffered a stroke resulting in mild right hemiparesis." (Id.) She could ambulate with a cane, and she was discharged on June 20, 2011 and placed on aspirin. (Id.) Following her discharge, Bush was seen a number of times by Baaba Forson ("Forson") of Henry J. Austin Health Center ("Austin Center"). (See Admin. R. at 517-26, Austin Ctr. Med. Rs.)[1] Forson's notes between June 30, 2011 and September 15, 2011 consistently reference Bush's right-side weakness following her stroke. (See id. at 517-19, 523-26.) During that period, Forson also reported, inter alia, that: (1) Bush had a "paralytic gait"; (2) she ambulates with a cane; (3) she had musculoskeletal and

---

[1] The ALJ refers to Forson throughout the decision as "Dr. Forson," and some documents in the record list Forson as a physician. (See, e.g., ALJ Decision at 29, 31; Admin. R. at 549, Forson Med. Source Statement.) In the opposition briefing, the Commissioner emphasizes that Forson is actually a nurse practitioner, a fact that Bush does not dispute. (See dkt. entry no. 15, Comm'r Opp'n at 8; dkt. entry no. 16, Pl.'s Reply Br. at 6.)

neurological symptoms, including "disturbances" and "dysfunction"; and (4) "[a] right hemiparesis was seen." (See id. at 517-19, 523-26.)

Medical records from Forson's colleagues at the Austin Center following Bush's stroke contain similar assessments. Leslie Rice found, following an August 12, 2011 examination, that Bush has "[s]troke syndrome," specifically that she "has multiple problems related to stroke. She has trouble keeping thoughts in her head and following them." (Id. at 522.) Dr. Kamal Puri reported, after examining Bush on August 30, 2011, that Bush suffered from pain in her mid back on the right side and that she takes "motrin" but it was not providing her "much relief." (Id. at 519.) Dr. Puri's notes state that her "[p]ain is there only periodically," but that at the time of the examination, Bush's pain was a 10 on a scale from zero (no pain) to ten (highest pain). (See id.)

In a Medical Source Statement dated October 12, 2011, Forson opined that Bush could: (1) walk one block without experiencing severe pain or requiring rest; (2) sit less than 2 hours in an eight hour work day; (3) stand or walk less than one hour in an eight hour work day; and (4) lift less than ten pounds occasionally. (Forson Med. Source Statement at 548.) Forson's report states, "[f]atigue is present, such as to prevent this patient from performing normal, full-time work activities on a frequent (more than 3-4 days per month) basis." (Id. at 549.)

## PROCEDURAL HISTORY

Bush, alleging an onset of disability on June 19, 2009, protectively filed applications for Social Security Disability Benefits on July 14, 2009 and for Supplemental Security

4

Income Benefits on December 1, 2009.  (Compl. at ¶ 5.)  The Social Security Administration ("SSA") twice denied the written claim: first upon the initial filing, and again upon a request for reconsideration.  (See id.)  Bush thereafter filed a request for a hearing before an SSA administrative law judge ("ALJ"), which was granted and held on October 28, 2011.  (Id.)

The ALJ issued an "Unfavorable Decision" on January 13, 2012 ("ALJ Decision"), which announced the ALJ's findings of fact and conclusions of law.  (See ALJ Decision at 24-33.)  The ALJ stated, inter alia, that:

> 1.  [Bush] meets the insured status requirements of the Social Security Act through December 31, 2014.
> 2.  [Bush] has not engaged in substantial gainful activity since June 19, 2009, the alleged onset date[.]
> . . .
> 3.  [Bush] has the following severe impairments: coronary artery disease, diabetes mellitus type II, congestive heart failure and asthma[.]
> [Bush] has also alleged having sleep apnea and she is obese[.]  The [ALJ] finds that . . . these impairments . . . are not considered to be "severe" impairments for the purposes of this analysis[.]
> . . .
> 4.  [Bush] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]
> In this regard, we note that [Bush's] impairments have not consistently been at any Listing level of severity since 2009.
> 5.  . . . [Bush] has the residual functional capacity to lift and carry up to twenty pounds occasionally and ten pounds frequently, sit for about six hours in an eight hour workday and stand and/or walk for about two hours in an eight hour workday, and can never climb ladders, ropes or scaffolds, but she can occasionally climb stairs, kneel, crouch and crawl.
> . . .
> 6.  [Bush] is unable to perform any past relevant work[.]
> . . .

5

>7. [Bush] was born on July 16, 1968 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date[.]
>8. [Bush] has at least a high school education and is able to communicate in English[.]
>9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Bush] is "not disabled," whether or not [Bush] has transferable job skills[.]
>10. Considering [Bush's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Bush] can perform[.]
>. . .
>11. [Bush] has not been under a disability, as defined in the Social Security Act, from June 19, 2009, through the date of this decision[.]

(Id. at 26-33 (citations omitted).) The ALJ, based on these conclusions, determined that Bush was not entitled to Benefits. (See id. at 33.)

Bush sought review of the ALJ Decision by the SSA Appeals Council ("Appeals Council") on March 9, 2012. (Compl. at ¶ 5.) The Appeals Council denied her request for review of the ALJ Decision. (See id.) Bush timely filed the Complaint before this Court on September 17, 2013, seeking judicial review of the ALJ Decision. (See Compl.) See 42 U.S.C. § 405(g); Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007) ("Because the Appeals Council denied review of the ALJ's decision, we review that decision as the final decision of the Commissioner.").

Bush outlines several points of error, which primarily relate to the ALJ's evaluation of her impairments following her stroke. First, she contends that the ALJ "failed to determine whether the residuals from [her] stroke were severe or not severe." (Dkt. entry no. 14, Pl.'s Br. at 19.) She argues that these limitations should have been considered in the ALJ's

formulation of her residual functional capacity ("RFC"). (Id. at 20.) Second, she argues that the ALJ failed "to assign any relevant non-exertional limitations in his formulation of RFC." (Id. at 21.) Third, Bush asserts that the ALJ erred by assigning little weight to the opinion of Forson regarding the functional limitations she experienced as a result of her stroke. (Id. at 22.) Finally, Bush contends that the ALJ failed to compare evidence of her "impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d)." (Id. at 24-25.)

Bush asks the Court to reverse the ALJ Decision and enter judgment awarding her Benefits. (See id. at 26). In the alternative, she asks the Court to remand the matter to the ALJ "for further action consistent with this Court's decision." (Id.)

The Commissioner opposes Bush's appeal and argues that the ALJ Decision should be affirmed. (See Comm'r Opp'n.)

## DISCUSSION

### I. Standard of Review

The Court has jurisdiction to review the ALJ Decision, but the review is limited. See 42 U.S.C. § 405(g). The Court has plenary review of legal issues. See Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). But the Court may only review the ALJ's findings of fact to determine whether they are supported by substantial evidence. See 42 U.S.C. § 405(g); Schaudeck, 181 F.3d at 431. "Substantial evidence," as defined in this context, is less than a preponderance of the evidence but "more than a mere scintilla"; it is such evidence "as a reasonable mind might accept as adequate to support a conclusion."

7

Richardson v. Perales, 402 U.S. 389, 401 (1971) (citations omitted) (internal quotation marks omitted).

"[T]he substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). The Court will not set aside the ALJ Decision "if it is supported by substantial evidence, even if we would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Nevertheless, the Court "retain[s] a responsibility to scrutinize the entire record[.]" Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

An ALJ decision must provide "sufficient development of the record and explanation of findings to permit meaningful review." Jones, 364 F.3d at 505. The ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," id., and the ALJ need not reference each and every treatment notation with particularity. See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001). But "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence and explain a rejection of the evidence." Schaudeck, 181 F.3d at 435 (internal citation omitted). The Court may not find that an ALJ decision is supported by substantial evidence unless the ALJ has analyzed the evidence and sufficiently explained the weight given to probative exhibits. Bordes v. Comm'r of Soc. Sec., 235 Fed.Appx. 853, 861 (3d Cir. 2007).

**II.     Analysis of Claim**

The Court concludes that the ALJ's findings of fact are insufficiently specific to permit meaningful review. In particular, the Court agrees with Bush's arguments that the ALJ did

8

not adequately consider and evaluate the medical evidence relating to Bush's impairments following her stroke in June 2011, including the medical records from the Austin Center (see Austin Ctr. Med. Rs. at 517-43), and that the ALJ improperly discounted, or assigned little weight to, Forson's opinion relating to Bush's condition following her stroke.  These issues permeated the ALJ Decision at each step in the analysis.

The vast majority of the ALJ Decision focuses on Bush's medical history prior to her stroke.  The record after her stroke is primarily comprised of notes from Forson and her colleagues relating to their treatment of Bush.  But the ALJ largely discounted this medical evidence.  The ALJ, after summarizing the details of the June 2011 stroke, stated, "Having considered the entire record, we assign little weight to Dr. Forson's opinion, as he failed to provide treatment notes or test results to support this conclusion; and are inconsistent with Dr. Weaner's findings, which indicated only mild residuals as a result of the claimant's stroke." (ALJ Decision at 29.)  The ALJ repeated this conclusion regarding Forson's "assessment that as a result of the stroke [Bush's RFC] has been reduced below the sedentary level." (Id. at 31.)  For the reasons that follow, the ALJ's basis for discounting Forson's opinion is insufficient, and this, combined with the lack of analysis relating to Bush's post-stroke condition, requires a remand for further proceedings.

The Court will first briefly address the parties' arguments relating to what, if any, weight may be accorded to Forson's opinion under the regulations.  The Commissioner argues that "NP Forson is not an 'acceptable medical source,' and therefore, her opinion is not considered a medical opinion under the regulations." (Comm'r Opp'n at 8.)  Bush counters

that opinions from nurse practitioners, who are technically not "acceptable medical sources," may still be evaluated in conjunction with other evidence on the issues of "impairment severity and functional effects." (Pl.'s Reply Br. at 6.) The Court agrees with Bush. The regulations provide that evidence from nurse practitioners, while not an "acceptable medical source," may be used "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d)(1). Social Security Rule 06-03p provides:

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR [§]404.1527(d)(2) and [§]416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

Soc. Sec. Admin., SSR 06-03p, Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2002 WL 2329939, at *5 (Aug. 6, 2006). Based on the foregoing, the Court concludes that the fact that Forson is not a physician does not preclude the ALJ, on remand, from assigning considerable weight to her opinions and observations given the limited evidence in the record from other "acceptable medical sources," including treating physicians, relating to Bush's condition after her stroke.

The Court concludes that the ALJ's findings relating to Forson and Dr. Weaner are not supported by the record. As previously discussed, Forson and her colleagues at the Austin Center documented the struggles Bush faced months after her stroke, such as her right-side weakness, motor disturbances and dysfunction, and difficulties keeping thoughts in her head. (Austin Ctr. Med. Rs. at 517-26.) Thus, the ALJ's assessment that Forson "failed to provide treatment notes" is contradicted by the record. (See ALJ Decision at 29, 31.)[2] Moreover, Dr. Weaner's report is not inconsistent with — nor as detailed as — the notes and opinions of Forson and her colleagues. The Consultation Report from Dr. Weaner, cited to by the ALJ as Exhibit 22-F, states:

> Motor testing reveals a slight drift of the right upper extremity with mild weakness at 4+. There is fixed arm roll on the right. There is mild weakness of the right lower extremity at 4 to 4+. There is decreased sensation to touch in the right arm and leg. . . . She is able to ambulate with a cane.
> . . . The patient has suffered a deep white matter stroke on the left resulting in a mild right hemiparesis. This is resulting in ambulatory dysfunction. She has multiple risk factors including hypertension, diabetes, and hyperlipidemia.

(Admin. R. at 633, Hospital Records.) Based on the language of this report, the Court concludes that neither the ALJ's finding that Forson's opinion is inconsistent with Dr. Weaner's Report nor the finding that Dr. Weaner's report "indicated only mild residuals" is

---

[2] The ALJ cites to Exhibit 17-F in conjunction with this statement. (See ALJ Decision at 29, 31.) However, Exhibit 17-F is Forson's Medical Source Statement, pages 544 to 560 of the Administrative Record, that Forson prepared presumably in connection with Bush's efforts to obtain Benefits. Exhibit 16-F, on the other hand, is the Austin Center Medical Records, pages 517 to 543 of the Administrative Record. These Medical Records contain the notes of Forson and her colleagues following their examinations of Bush in the months after her stroke. The fact that the ALJ does not reference Exhibit 16-F and that the ALJ stated that Forson did not provide her notes causes the Court to suspect that the ALJ may have overlooked Exhibit 16-F, which is, in fact, the notes of Forson and others.

supported by substantial evidence. (See ALJ Decision at 29.) The report of Dr. Weaner, who appears not to have evaluated Bush beyond this single report issued right after her stroke, lists similar symptoms, such as "mild right hemiparesis" and "ambulatory dysfunction" (see Hospital Records at 633), to those documented by Forson and others, who continued to treat Bush over the months following Bush's stroke.

The Court, for these reasons, agrees with Bush's arguments challenging the ALJ Decision, particularly her contention that the ALJ improperly "assign[ed] little weight" to Forson's opinion based on the purported failure to provide treatment notes and the inconsistency with Weaner's opinion. (See Pl.'s Br. at 22.) The ALJ's view of Forson's opinion contributed to the larger failure of the ALJ to adequately evaluate the impairments suffered by Bush following her stroke.

The record further suggests that, whatever the state of Bush's impairments prior to her stroke, her condition changed and potentially even worsened following her stroke. The ALJ, on remand, should consider bifurcating the analysis between Bush's impairments before the stroke and her impairments after the stroke. As it stands, the ALJ's analysis focuses heavily on the pre-stroke medical evidence and does not sufficiently consider the post-stroke evidence. The Court is cognizant that the ALJ was evaluating Bush's entitlement to Benefits from June 19, 2009, the alleged onset date, to the date of the decision, January 13, 2012. (See ALJ Decision at 33.) And the Court is also aware that the regulations contain a "duration requirement," which provides that an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Court,

therefore, understands the ALJ's inclination to apply one analysis for the entire period under review. However, given the unique factual circumstances, it is conceivable that the ALJ may not reach the same result if the analysis were performed using the date of the stroke, June 17, 2011, as the onset-of-disability date.[3]

The ALJ is permitted to consider a different onset date than that relied upon by Bush. The regulations provide:

> If you file an application for benefits . . . before the first month you meet all the requirements for entitlement, the application will remain in effect until we make a final determination on your application unless there is an administrative law judge hearing decision on your application. If there is an administrative law judge hearing decision, your application will remain in effect until the administrative law judge hearing decision is issued.
> (1) If you meet all the requirements for entitlement while your application is in effect, we may pay you benefits from the first month that you meet all the requirements.
> (2) If you first meet all the requirements for entitlement after the period for which your application was in effect, you must file a new application for benefits. . . .

20 C.F.R. § 404.620(a). The Court interprets this to mean that the ALJ, when evaluating whether Bush was disabled between June 19, 2009 and January 13, 2012, may determine that she met the requirements for Benefits during some smaller portion of this time period, even though her application seeks coverage prior to the date on which the ALJ finds that the requirements for entitlement are satisfied. In such a case, Bush would be entitled to Benefits "from the first month that [she met] all the requirements." Id. Cf. Johnson v. Sullivan, 922

---

[3] The fact that the Court concludes the analysis for the period following Bush's stroke was insufficient should not be construed as the Court's belief that Bush will prevail on remand. The Court leaves the evaluation of the evidence on remand, in the first instance, to the ALJ.

F.2d 346, 356 (7th Cir. 1990) (claimant's application for benefits remained in effect until final administrative determination or until ALJ's hearing decision was issued); Dixon v. Shalala, 54 F.3d 1019, 1039 (2d Cir. 1995) (same); Castellano v. Astrue, No. 07-4608, 2008 WL 2951925, at *1 n.2 (S.D.N.Y. July 30, 2008) ("Our review is therefore limited to the ALJ's determination that Castellano was not disabled between . . . the alleged onset date[] and . . . the date of decision." (citing 20 C.F.R. § 404.620(a))).

The ALJ treated Bush's claim for Benefits over the entire period under one analysis, and that analysis rested heavily on factual findings based upon the medical evidence prior to her June 2011 stroke. With regard to the durational requirement, the ALJ stated that there was "insufficient medical evidence in the record, regarding [Bush's] conditions, to find that she had functional limitations to such a disabling degree, as to preclude the performance of all work activity on a sustained basis for a period of 12 continuous months, at any time through the date of this decision." (ALJ Decision at 32.) Similarly, with regard to the severity requirement, the ALJ stated, "[Bush's] impairments have not consistently been at any Listing level of severity since 2009." (Id. at 30.) Given the unique circumstances here, the Court concludes that separate consideration is required for the periods before and after her stroke. On remand, the ALJ, using the date of the stroke as the onset date, should evaluate whether Bush's impairments meet the disability and durational requirements. When performing the post-stroke analysis, the ALJ should also appropriately consider the evidence relating to Bush's condition following her stroke in light of the aforementioned conclusion that the

ALJ's initial findings regarding her post-stroke condition, particularly his treatment of Forson's opinion, were not supported by substantial evidence.

The Court will thus remand the matter for further proceedings.  See <u>Bordes</u>, 235 Fed.Appx. at 865-66 (remanding where ALJ failed to properly develop the record).  Upon remand, the ALJ must sufficiently establish the factual basis for all conclusions relating to Bush's pre- and post-stroke condition.

## CONCLUSION

For the reasons discussed above, the Court will remand the matter for further proceedings.  The Court will issue an appropriate Order.

  s/ Mary L. Cooper  
**MARY L. COOPER**  
United States District Judge

Date:          July 31, 2014